**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **The Norton Construction Co.,** | ) | **CASE NO.  1:03 CV 2257** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **U.S. Army Corps of Engineers, et al.** | ) | **Memorandum of Opinion & Order** |
| | ) | |
| **Defendants.** | ) | |

### Introduction

This matter is before the Court upon (1) plaintiff The Norton Construction Company's Merits Brief (Doc. 47); (2) defendant United States Army Corps of Engineers' and William J. Bulen's Merits Brief (Doc. 52); and (3) the defendants' Request to Present Unpublished Authority (Doc. 54).  This case involves the refusal of the defendants U.S. Army Corps of Engineers ("Corps") and William J. Bulen to adjudicate an individual dredge and fill permit application submitted by plaintiff The Norton Construction Company d/b/a Norton Environmental ("Norton") under Section 404 of the Clean Water Act with respect to the

proposed construction of a solid waste sanitary landfill in Tuscarawas County, Ohio.

The issues presently before the Court are (1) whether the appropriations riders at issue should be interpreted to prevent the Corps from processing plaintiff's permit application; (2) whether plaintiff's constitutional claims are a "disguised" takings claim over which this Court lacks jurisdiction; (3) whether the riders violate plaintiff's federal constitutional equal protection and due process rights; and (4) whether the riders violate the separation of powers doctrine.  For the following reasons, the Court (1) grants judgment in favor of the plaintiff Norton; and (2) finds the United States' Request to Present Unpublished Authority moot.

### Facts

Plaintiff Norton is an Ohio corporation which provides solid waste collection, recycling, and disposal services in Northeast Ohio, principally Medina, Cuyahoga, Wayne, Summit, Portage and Stark counties.  (First Am. Complt. at ¶ 2).  Plaintiff alleges that the waste material it currently collects is predominantly disposed of at two sanitary landfills: the Royalton Road Landfill in Broadview Heights, Ohio and the Mount Eaton East Landfill in Mt. Eaton, Ohio. (First Am. Complt. at ¶ 10).

According to plaintiff, both of these landfills are near capacity and will be closing in the next few years.  (First Am. Complt. at ¶ 10).  Accordingly, in the mid-1990s, plaintiff began to search for locations in Northeast Ohio to create a new sanitary landfill.  (First Am. Complt. at ¶ 12).  Plaintiff ultimately identified a 330-acre site in a rural section of Tuscarawas County, Ohio as a suitable location.  (First Am. Complt. at ¶¶ 8, 13).  This site will be referred to herein as the proposed Ridge Sanitary Landfill.

Defendant U.S. Army Corps of Engineers ("Corps") is the federal agency which has been

2

delegated the responsibility for reviewing and processing applications for dredge and fill permits under Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344.  (First Am. Complt. at ¶ 3).  In connection with the construction of the proposed Ridge Sanitary Landfill, plaintiff submitted a completed application to the Huntington District of the defendant Corps, seeking an individual dredge and fill permit under CWA Section 404.  (First Am. Complt. at ¶ 15).[1] Pursuant to Section 404(a) and 33 C.F.R. § 325.2(d), the Corps began its review process by issuing a public notice, holding a public hearing, and receiving public comments. (First Am. Complt. at ¶ 20).

On October 16, 2002, before the Corps issued a decision, plaintiff Norton alleges that it "temporarily deactivated" its permit application in order to afford the Ohio Historic Preservation Office the opportunity to complete its evaluation of the potential landfill, and to afford the Corps and the Ohio Environmental Protection Agency ("Ohio EPA") additional time to examine supplemental data relating to the project.  (First Am. Complt. at ¶ 20).   Plaintiff states that, by spring 2003, the Ohio Historic Preservation Office concluded that the project would not adversely affect historical resources, and the Corps and Ohio EPA completed their review of the additional data provided by plaintiff.  (First Am. Complt. at ¶ 21).  Thereafter, on May 16, 2003, plaintiff alleges that it "officially reactivated" its permit application and requested that the Corps complete the processing of its application and issue a final decision.  (First Am. Complt. at ¶ 21).

On June 13, 2003, the Corps (through District Engineer Colonel John Rivenburgh) issued a letter to plaintiff acknowledging receipt of plaintiff's request for reactivation and stating the

---

[1]     Plaintiff alleges that approximately 7.19 acres of wetlands and 3455 linear feet of streams fall within the jurisdiction of the defendant Corps.

following:

> As you are aware, the United States Congress has passed, and the President signed, Public Law 108-7 which contained language that prohibits the Huntington District's Regulatory Branch from expending appropriated funds on the evaluation of the Ridge Landfill permit application. The legislation was carefully reviewed by Corps legal counsel in Washington D.C., and they determined that I am not authorized to reinitiate my evaluation of your permit application at this time.

(June 13, 2003 letter to plaintiff, attached as Exhibit A to First Am. Complt.). On this basis, the Corps indicated that it was "withdrawing your application and returning it to you." *Id*.

The legislation referred to by the defendant Corps in the above letter is the Consolidated Appropriations Resolution for fiscal year 2003. This Resolution contains, among other things, an appropriations rider that provides that "[n]one of the funds appropriated in this or any Act may be used by the United States Army Corps of Engineers to support activities related to the proposed Ridge Landfill in Tuscarawas County, Ohio." (First Am. Complt. at ¶ 23). This same exact language is also contained in Section 102 of the Energy and Water Development Appropriations Act of 2004, Pub. L. 108-137 (December 1, 2003) and Section 102 of Division C, Title I of the Consolidated Appropriations Act, 2005, Pub. L. No. 108-447 (December 8, 2004). (First Am. Complt. at ¶ 24; Stipulations at Definitions ¶ (a), attached as Exh. A to plaintiff's Merits Brief).

Shortly after receiving the Corps' June 13, 2003 letter, plaintiff sent a letter to the Corps, stating that it was not withdrawing its application and asking the Corps to comply with its "mandatory duty" to either issue or deny plaintiff's permit application. (First Am. Complt. at ¶ 27). In response, defendant Corps (through defendant Colonel William Bulen) again refused to reactivate plaintiff's permit application, stating that it was not authorized to reinitiate its evaluation of plaintiff's application and that it considered said application "withdrawn and not

4

pending in my office."  (August 4, 2003 letter from Colonel Bulen to plaintiff, attached as Exh. B to the First Am. Complt.).

Plaintiff thereafter filed its Complaint in this Court on November 5, 2003 against the defendant Corps and defendant William E. Bulen.  Plaintiff subsequently filed a First Amended Complaint on March 3, 2004.  Therein, plaintiff alleges seven counts.  Count One alleges a claim for judicial review under the Administrative Procedures Act, 5 U.S.C. § 706.  Count Two seeks a writ of mandamus to compel defendants to reinstate and complete the adjudication of plaintiff's permit application.  Count Three seeks a declaration of the parties' rights and obligations under the Declaratory Judgment Act, 28 U.S.C. § 2201.  Counts Four and Five allege violations of plaintiff's procedural and substantive due process rights in violation of the Due Process Clause of the Fifth Amendment of the United States Constitution.  Count Six alleges an equal protection violation under the Fifth Amendment of the U.S. Constitution.  Count Seven alleges that the appropriations riders at issue violate the federal constitutional requirement of separation of powers.

On April 7, 2004, defendants filed their Motion to Dismiss First Amended Complaint.  In a Memorandum of Opinion & Order dated June 14, 2004, this Court granted in part and denied in part defendants' Motion.  Specifically, the Court granted defendants' Motion and dismissed (1) plaintiff's claim in Count I alleging unreasonable delay under the APA; and (2) plaintiff's mandamus claim in Count II.  The Court denied defendants' Motion in all other respects, including defendants' motion to dismiss plaintiff's APA claim for agency action "unlawfully withheld."

On July 12, 2004, defendants filed a Motion for Partial Reconsideration of this Court's

June 14, 2004 Opinion & Order.  The Court denied defendants' Motion via Memorandum of Opinion & Order dated September 10, 2004.

Plaintiff then filed its Merits Brief on December 23, 2004, and defendants filed their Merits Brief on February 4, 2005.   Defendants subsequently filed a Request to Present Unpublished Authority in support of its Merits Brief on March 10, 2005.   Plaintiff filed its Response on March 16, 2005.  It is these Motions that are currently before the Court.

**<u>Discussion</u>**

In its Merits Brief, plaintiff Norton first argues that, in order to avoid a finding of unconstitutionality, this Court should interpret the appropriation riders at issue as not prohibiting the defendant Corps from processing plaintiff's permit application.  Specifically, plaintiff argues that the riders only preclude the Corps from expending funds that "support activities" at the Ridge Landfill.  Because the Corps is a neutral party in determining whether plaintiff's landfill proposal complies with the Clean Water Act (and, thus, is neither a proponent or opponent of the Ridge Landfill), plaintiff maintains that the mere processing of its permit application does not constitute the type of "support" for which funds may not be expended.  Accordingly, plaintiff argues that the Court should find that defendants have interpreted the riders in an overly restrictive manner and issue an Order requiring the Corps to process plaintiff's permit application.

Should the Court reject this argument, plaintiff then argues that the riders are unconstitutional on several grounds.  First, plaintiff argues that the riders violate the equal protection clause of the U.S. Constitution because they deny plaintiff the same right to be heard on the merits as is granted to all other permit applicants.  Next, plaintiff maintains that the riders

violate both its substantive and due process rights because they deny plaintiff the right to establish that its proposed landfill would comply with the Clean Water Act. Finally, plaintiff argues that the riders are unconstitutional on the grounds that they violate the separation of powers doctrine.

This Memorandum of Opinion & Order will address each of these arguments in turn.

## I.      Interpretation of the Riders

As set forth above, the appropriations riders at issue provide that "[n]one of the funds appropriated in this or any Act may be used by the United States Army Corps of Engineers to support activities related to the proposed Ridge Landfill in Tuscarawas County, Ohio." *See* Section 102 of the Energy and Water Development Appropriations Act of 2004, Pub. L. 108-137 (December 1, 2003); Section 102 of Division C, Title I of the Consolidated Appropriations Act, 2005, Pub. L. No. 108-447 (December 8, 2004); Stipulations at Definitions ¶ (a).

Plaintiff argues that defendants' interpretation of the above language as precluding the processing of plaintiff's permit application is overly narrow and renders the riders unconstitutional. Specifically, plaintiff notes that the riders only preclude the Corps from expending funds to "support activities" at the Ridge Landfill, and that the only construction of this phrase that is both constitutional and consistent with the Clean Water Act is to construe the term "support" to mean "to advocate." In particular, plaintiff notes that, under its own regulations, the Corps is "neither a proponent nor opponent" of an individual permit application. *See* 33 C.F.R. § 320.1(a)(4) (providing that "[t]he Corps is neither a proponent nor opponent of any permit proposal"). Thus, none of the funds that the Corps would normally expend in processing plaintiff's permit application would fall within the scope of the riders because those

funds would not be used to "support" (i.e., to advocate) the Ridge Landfill.

Plaintiff then advances two further arguments in support of this construction.  First, plaintiff argues that its construction of the riders is most consistent with the requirement in Section 404 of the Clean Water Act that the Corps issue a final decision granting or denying plaintiff's permit application.  Second, plaintiff maintains that adopting its interpretation of the riders would prevent the Court from having to reach the serious constitutional concerns presented by plaintiff and potentially finding the riders unconstitutional.

In response, defendants argue that they reasonably interpreted the appropriations riders to preclude the expenditure of any funds relating to the processing of plaintiff's permit application. Defendants note the broad, non-specific language of the riders themselves and stress different meanings of the term "support" that are consistent with the Corps' interpretation.  Specifically, defendants argue that, in addition to meaning "to advocate," the term "support" can also mean "to maintain in existence or in operation; keep up, keep going. . . preserve from failure."  *See* The New Shorter Oxford English Dictionary, Vol. 2 at 3153.   Taken in this context, any funds expended by the Corps to process and take final action on plaintiff's permit application would fall within the definition of "support" because they would necessarily maintain the application in existence and preserve it from failure.[2]

Defendants further argue that plaintiff's construction would effectively render the  riders meaningless.  Defendants assert that, since plaintiff's project is not a public works project, the

---

[2]        Defendants further note that the term "support" modifies only the word "activities" and not the phrase "proposed Ridge Landfill."  Thus, according to defendants, the issue under the riders is only whether the Corps' "activities" would be "related to" the proposed Ridge Landfill, which they clearly would be.

8

only "activities" that the Corps would conceivably undertake in relation to the Ridge Landfill are the acts of processing and taking final action on plaintiff's application.  Interpreting the riders to nonetheless allow the Corps to spend appropriated funds to process plaintiff's permit application would therefore render the riders meaningless.  Moreover, defendants note that plaintiff's construction of the riders "compels the untenable conclusion that Congress prohibited only that which is already prohibited by the regulations, i.e. the Corps acting as a 'proponent' of a permit proposal."  (Defendants' Merits Brief at 8).  Defendants maintain that such a construction renders the riders redundant with 33 C.F.R. § 320.1(a)(4) and that, for the riders to have any meaning at all, they must be interpreted more broadly to prohibit all activities relating to the processing of plaintiff's permit application.

Finally, defendants argue that their construction is more consistent with Congressional intent.  Although there is no formal legislative history associated with these riders, defendants cite numerous public statements of the sponsoring legislators[3] which confirm that Congress intended the riders to prevent the expenditure of any funds relating to the processing of plaintiff's permit application.  For example, defendants point to a September 18, 2002 letter to the Corps from Congressmen Regula and Ney and Senators DeWine and Voinovich, in which they expressed their opposition to Ridge Landfill and their desire that the Corps not approve plaintiff's application.  *See* Admin. Rec. 9K.  With regard to the riders themselves, defendants point to an article in which Congressman Ney is reported as describing the rider as "a safeguard to prevent the landfill from going forward in the event that it would receive approval from the

---

[3]     The parties agree that the riders were sponsored by three Congressmen: Ralph Regula (Ohio's 16th Congressional District); Robert Ney (Ohio's 18th Congressional District); and David Hobson (Ohio's 7th Congressional District).

Corps." *See* Admin. Rec., Exh. 3.   Congressman Ney is also quoted as describing the riders as "a safety valve that brings [the Ridge Landfill] project" to a halt" and "one way of stopping an agency." *See* Admin. Rec., Exh. 4.

Lastly, defendants cite a Press Release from Congressman Regula indicating that the purpose of the riders was to "prohibit federal approval of the proposed Ridge Landfill" and to "prohibit the U.S. Army Corps of Engineers . . . from using its funds for any activities related to [the] proposed landfill[]." *See* Admin. Rec., Exh. 5.  In that Press Release, Congressman Regula states that "I had [the rider] included because I, like many residents in the local community, have serious concerns with the potential risks associated with [this] landfill[]." *Id.*

Based on the above, defendants maintain that both the plain language of the riders and the above statements of the sponsoring legislators support the Corps' interpretation of the riders to preclude the processing of plaintiff's permit application.

As the Supreme Court has explained, when an agency has acted pursuant to its interpretation of its governing statute,[4] courts are required to determine whether the agency's interpretation is entitled to deference and, if so, at what level.  *See United States v. Mead Corp.*, 533 U.S. 218 (2001); *Chevron v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Ohio Public Interest Research Group, Inc. v. Whitman*, 386 F.3d 792, 795 (6th Cir. 2004).   In reviewing an agency's interpretation of a statute it administers, courts must first ask "whether Congress has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 842.  If, after employing traditional tools of statutory construction, Congress' intent is clear, then "that is

---

[4]    The Court is not entirely convinced that the appropriations riders herein constitute the Corps' "governing statute," to which *Chevron* principles would apply. However, as neither party raises the issue, the Court has not addressed it herein.

the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-843.  *See also Fullenkamp v. Veneman*, 383 F.3d 478, 481 (6th Cir. 2004).  Or, as the Sixth Circuit has put it, "an agency's interpretation of its governing statute that contravenes Congress' unambiguously expressed intent is not entitled to judicial deference."  *Ohio Public Interest Research Group, Inc*., 386 F.3d at 795.

If the statute is silent or ambiguous with respect to the specific issue at hand, "the question is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.  Before according deference to agency interpretations, a federal court "need not find that [the agency's interpretation] is the only permissible construction . . . but only that [its] understanding of this . . . statute is a sufficiently rational one to preclude a court from substituting its judgment for that of [the agency]."  *Chem. Mfrs. Ass'n v. Natural Resources Defense Council*, 470 U.S. 116, 125 (1985).

That being said, the Supreme Court has also made clear that "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result."  *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 172 (2001).  "This requirement stems from our prudential desire not to needlessly reach constitutional issues and our assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority."  *Id*. at 172-173.  Thus, "'where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.'"  *Id*. (quoting *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr.*

11

*Trades Council*, 485 U.S. 568, 575 (1988)).

The Court agrees with defendants that the Corps' refusal to process plaintiff's permit application is based upon a reasonable and permissible construction of the riders. Plaintiff does not dispute that the only "activities" which defendants could conceivably undertake in relation to the Ridge Landfill would be the acts of processing and taking final action on plaintiff's permit application. Moreover, plaintiff itself acknowledges that the Corps' own regulations prohibit it from advocating any individual permit application before it. Given this context, the Court finds that plaintiff's construction of the riders is neither reasonable nor logical. Since the Corps would not normally (and is, in fact, not permitted to) advocate plaintiff's permit application, it does not make sense that Congress would pass a rider prohibiting precisely that. Plaintiff's construction, then, essentially renders the riders redundant and meaningless. While plaintiff is correct that the Court should not needlessly reach constitutional issues, the Court finds that it cannot reasonably accomplish this objective by rendering an act of Congress meaningless.

Accordingly, for the reasons set forth above, the Court rejects plaintiff's construction and finds that the defendants reasonably interpreted the appropriations riders at issue to preclude the Corps from processing and taking final action on plaintiff's permit application.

## II.        Constitutional Claims

Plaintiff next argues that, under the defendants' interpretation, the appropriations riders are unconstitutional because they violate (1) plaintiff's equal protection rights; (2) plaintiff's substantive and procedural due process rights; and (3) the separation of powers doctrine.

Defendants' primary argument in response is that plaintiff's equal protection and due process claims are, in fact, "disguised" takings claims which are precluded by the Tucker Act, 28

12

U.S.C. § 1491(a)(1) and over which this Court lacks jurisdiction.  Defendants then argue that, if the Court reaches plaintiff's equal protection claim, that claim fails because (1) plaintiff has not shown a classification or disparate treatment and (2) the riders are rationally related to a legitimate governmental interest.  With respect to plaintiff's due process claims, defendants argue that these claims fail because plaintiff has failed to establish a protected property interest.  Finally, defendants argue that plaintiff's separation of powers claim lacks merit because the riders "comfortably reside" within Congress' appropriations and Commerce Clause authority.

This Memorandum of Opinion & Order will first address defendants' takings argument.

### A.    Takings Clause

Defendants argue that plaintiff's real interest in this case is in the use of its property and in obtaining compensation for the economic loss in value to its property allegedly resulting from the riders.  As such, defendants maintain that plaintiff's constitutional claims are actually "disguised takings claims," since they allege uncompensated economic injury to real property resulting from the existence of a governmentally-imposed restriction.

Defendants then argue that, because plaintiff's claims are truly takings claims, its substantive and procedural due process claims are foreclosed as a matter of law.  Specifically, defendants cite Sixth Circuit case law for the proposition that, where government interference with private property is alleged, there is "no room left for the concept of substantive due process."  *Montgomery v. Carter County, Tennessee*, 226 F.3d 758, 769 (6th Cir. 2000).

With regard to plaintiff's procedural due process claim, defendants argue that this claim is foreclosed because there is adequate post-deprivation process under the Tucker Act, 28 U.S.C. § 1491(a)(1).  Defendants note that Congress has given the Court of Federal Claims exclusive

13

jurisdiction over Fifth Amendment claims exceeding $10,000.[5]  Because plaintiff has alleged

losses far in excess of this jurisdictional limit, defendants claim that plaintiff's action should

have been filed in Federal Claims Court.  Moreover, defendants cite Sixth Circuit case law for

the proposition that plaintiff's claim for equitable relief is not available where a suit for

compensation can be brought.  *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016-1017

(1984); *Anchor-Pointe Boat-A-Minimum Ass'n, Inc. v. Meinke*, 860 F.2d 215, 218-19 (6th Cir.

1988).  Thus, defendants argue that plaintiff has "filed its taking claim in the wrong forum and

sought inappropriate relief."  (Defendants' Merits Brief at 15).

  Lastly, defendants maintain plaintiff's equal protection claim is barred because it is "no

less a 'disguised' takings claim that its due process claims," as they both rely on the same facts,

allege the same injury, and seek identical declaratory and injunctive relief.  (Defendants' Merits

Brief at 19).[6]

  Plaintiff responds as follows. First, plaintiff asserts that its constitutional claims are not

---

[5] The Tucker Act, 28 U.S.C. § 1491(a)(1), vests the Court of Federal Claims with exclusive jurisdiction to render judgment upon any claim against the United States for money damages exceeding $10,000 that "is founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  *Id*.  The Sixth Circuit recently noted that "[i]t is well-established that '[r]egardless of the nature of relief sought, the availability of the Tucker Act remedy renders premature any takings claim in federal district court.'"  *Coalition for Government Procurement v. Federal Prison Industries, Inc.,* 365 F.3d 435, 479 (6th Cir. 2004) (quoting *Eastern Enter. v. Apfel*, 524 U.S. 498, 521 (1998)).

[6] Defendants also argue that plaintiff's equal protection claim is precluded due to plaintiff's failure to pursue its takings claim in the Federal Claims Court, i.e., that this claim is not yet ripe since other procedural avenues remain.  *See Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1362-63 (6th Cir. 1992).  This argument is addressed, *infra*, in Section II.B of this Memorandum of Opinion & Order.

14

"disguised takings claims" because the injuries for which they seek redress do not arise from governmental interference with their real property.  Rather, plaintiff argues that the injury which forms the basis of its equal protection claim is the unconstitutional denial of equal treatment.  *See Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (stating that where "the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group , . . . the 'injury-in-fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit").  Likewise, plaintiff claims that the injuries which form the basis of its substantive and due process claims are not directly related to the loss of the use of its property but arise instead from the allegedly arbitrary and capricious nature of the Corps' actions.  In addition, plaintiff argues that its claims are not takings claims because it is not seeking damages for the uncompensated economic loss in value to its property but, rather, declaratory and injunctive relief to obtain the reinstatement of its permit application.

Finally, plaintiff argues that its claims are not takings claims because they constitute a direct challenge to the constitutionality of the riders.  In support of this argument, plaintiff cites case law for the proposition that where a party is not seeking compensation for a taking but, rather, a declaratory judgment that a federal statute is unconstitutional, the district court has jurisdiction as opposed to the Court of Federal Claims.  *See e.g. Coalition for Government Procurement v. Federal Prison Industries, Inc*., 365 F.3d 435, 480 (6th Cir. 2004).  Thus, plaintiff maintains that defendants' takings arguments are without merit, and that the Court should reach the merits of its equal protection, due process and separation of powers claims.

15

The Takings Clause of the Fifth Amendment provides, in relevant part, " . . . nor shall private property be taken for public use, without just compensation."  U.S. Const., Amend. V. The primary purpose of the Takings Clause is to "bar Government from forcing some people alone to bear burdens which, in all fairness and justice, should be borne by the public as a whole."  *Armstrong v. United States*, 364 U.S. 40, 49 (1960).  The Supreme Court has recognized two categories of takings: physical and regulatory.  *See Penn Central Transp. Co. v. City of New York*, 438 U.S.104 (1978).  A physical taking, as the name implies, occurs where the government physically intrudes upon a plaintiff's property.  *Waste Management, Inc. v. Metropolitan Government of Nashville and Davidson County*, 130 F.3d 731, 737 (6th Cir. 1997).  "[A] permanent physical occupation is a government action of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine."  *Id.* (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982)).

A regulatory taking occurs where, although there is no physical invasion, a regulation or other governmental action "goes too far" in depriving property of economic value.  *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).  Regulatory takings law incorporates both a "categorical taking," where a regulation deprives property of all value, and a "non-categorical" taking, where property is deprived of some, but not all of its economic value, as a result of governmental regulation.  *See Coalition for Government Procurement v. Federal Prison Industries, Inc.*, 365 F.3d 435, 482-483 (6th Cir. 2004). "In the categorical-taking case, once it is proven that a regulation has deprived the land of all economic value, compensation is automatically required under the Fifth Amendment."  *Anderson v. Charter Township of Ypsilanti*, 266 F.3d 487, 493 (6th Cir. 2001).

16

Where a party alleges a non-categorical taking, the Supreme Court has employed an "ad hoc, factual inquiry." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992). While declining to lay out a set formula, the Supreme Court has identified several factors which have "particular significance" in determining whether there has been a taking: (1) the character of the governmental action; (2) the economic impact of the regulation on the claimant; and (3) the extent to which the regulation has interfered with the claimant's distinct investment-backed expectations. *Waste Management, Inc.*, 130 F.3d at 737. *See also Connolly v. Pension Benefit Gty. Corp.*, 475 U.S. 211, 224 (1986); *Penn Central*, 438 U.S. at 124.

For the following reasons, the Court rejects defendants' argument that plaintiff's claims should be considered "disguised" takings claims under the Fifth Amendment. First, plaintiff has not explicitly plead a takings claim in its Amended Complaint. Indeed, the word "taking" does not appear anywhere in that pleading.[7] Moreover, as plaintiff correctly notes, the principal injury complained of in the Amended Complaint is not the uncompensated economic loss in value to plaintiff's property but, rather, the defendants' allegedly unconstitutional denial of equal treatment and due process of law in connection with its refusal to process plaintiff's permit application. The Sixth Circuit has, in fact, recognized that the type of injury addressed by takings claims is distinct from that addressed by due process claims. *See e.g. Nasierowski Brothers Investment Co. v. City of Sterling Heights*, 949 F.2d 890, 894 (6th Cir. 1991) ("[c]onceptually, in the case of a procedural due process claim, 'the allegedly infirm process is an injury in itself,' . . .

---

[7]     Defendants note that plaintiff's original complaint, while it did not expressly plead a takings claim, stated in a footnote that the riders "would also effectuate a compensable taking of Plaintiff's property within the meaning of the Fifth Amendment of the U.S. Constitution." (Complt. at ¶ 26, fn 1). However, this footnote is conspicuously absent from plaintiff's Amended Complaint.

17

whereas, in the context of a takings claim, the alleged injury [is] a diminution in property value .

. . ").

        This is most aptly demonstrated by the nature of relief requested by plaintiff herein.  As is

clear from the Amended Complaint, plaintiff is not seeking monetary damages for the alleged

economic loss in value to its property, nor is it seeking an Order requiring the Corps to issue it a

Section 404 permit.[8]  Rather, plaintiff is seeking an Order from this Court requiring the Corps to

reinstate plaintiff's permit application and complete its adjudication thereof in accordance with

Section 404 of the Clean Water Act.  *See* Amended Complt. at Prayer for Relief, Paragraph A

(seeking declaratory and injunctive relief in the form of an Order from this Court "compelling

Defendants to reinstate and to complete the adjudication of Plaintiff's permit application in

accordance with the standards and procedures set forth in Section 404 of the Clean Water Act

and the regulations promulgated thereunder").  In other words, plaintiff is seeking an Order

requiring defendants to accord it the equal treatment and due process of law that it claims it has

been unconstitutionally denied.  Given the harmony between plaintiff's alleged constitutional

injuries and the nature of the relief requested, the Court finds that plaintiff's claims are not

---

[8]     Defendants place much emphasis on plaintiff's allegation that "Defendants have wrongfully deprived Norton of the lawful and permitted use of its Property and caused significant and continuing financial injury arising from the loss of its investment and use of its Property."  (Amended Complt. at ¶ 28).  The Court finds that this allegation does not, standing alone, transform plaintiff's constitutional claims into takings claims. As plaintiff notes, this allegation is but one, isolated paragraph in the Fact Section of its Amended Complaint.  The allegations of deprivation of use and financial injury are not repeated in any of the specific Counts set forth in the Amended Complaint or in the Prayer for Relief. Accordingly, and for the reasons discussed above, the Court finds that this one statement alone does not demonstrate that plaintiff has, in fact, pled a "disguised" takings claim.

"disguised" takings claims but, rather, allege both injury and relief consistent with equal
protection and due process theories.

In addition, the Court rejects defendants' argument that plaintiff has sought equitable
relief in an attempt to "artfully plead" its way around the jurisdictional requirements of the
Tucker Act.  It is true that "a party cannot circumvent the Tucker Act 'by suing solely for
declaratory or injunctive relief in a case where such relief is tantamount to a judgment for money
damages.'" *Coalition for Government Procurement*, 365 F.3d at 480 (quoting *Veda v. United
States Dep't of the Air Force*, 111 F.3d 37, 39 (6th Cir. 1997)).  Moreover, the Sixth Circuit has
noted that "[w]here the complaining party's 'prime objective' is simply to obtain money from the
federal government, the case belongs in federal claims court."  *Id*.

In the instant case, however, the plaintiff's prime objective is to obtain an Order requiring
the Corps to process and issue a final decision regarding its permit application.  The Court finds
that such requested relief is not monetary in nature and, if granted, would not be "tantamount" to
a judgment for money damages.  Thus, the Court rejects defendants' argument to the contrary.

Accordingly, for all the reasons set forth above, the Court finds that plaintiff's claims do
not constitute a "disguised" takings claim.  Because the Court has so found, the Court further
finds that it need not reach defendants' arguments that plaintiff's substantive and procedural due
process claims are foreclosed from review.[9]

---

[9]     The United States' Request to Present Unpublished Authority (Doc. 54) relates
solely to its argument that plaintiff's substantive due process claim is foreclosed
by its takings claim.   In light of the Court's finding that it need not reach this
argument, the Court finds that the United States' Request is moot.

## B.    Equal Protection

Count Six of plaintiff's Amended Complaint alleges that "[b]y summarily rejecting and returning Plaintiff's permit application without applying the standards or procedures mandated by the CWA and the applicable regulations and afforded to all other applicants for permits, Defendants have violated the equal protection guarantees of the Fifth Amendment by intentionally and arbitrarily discriminating against Norton and treating Norton differently from all other applicants who have their applications adjudicated on the merits and in accordance with the CWA and applicable regulations. There is no rational basis for such disparate treatment." (Amended Complt. at ¶ 61).

In its Merits Brief, plaintiff explains that the basis of its equal protection claim is the defendants' allegedly arbitrary decision to exclude plaintiff from the adjudicatory process established by the Clean Water Act for applying to the Corps for a Section 404 permit to dredge and fill jurisdictional wetlands.  Plaintiff maintains that, having established this single administrative process for those who wish to develop land encompassing jurisdictional wetlands, Congress cannot now "arbitrarily deny particular groups or individuals the equal protection of the laws by categorically prohibiting them from presenting their legitimate applications to the agency or by prohibiting the agency from processing such applications once presented."  (Plaintiff's Merits Brief at 13).  Plaintiff further notes that applying to the Corps for a Section 404 permit is the sole remedy available to those, like plaintiff, who wish to develop property with jurisdictional wetlands in compliance with law, and that this remedy must be exhausted before an applicant may assert its legal right to a permit in the courts.

By enacting the appropriations riders at issue, however, plaintiff claims that Congress has

20

intentionally singled plaintiff out[10] for disparate treatment by prohibiting the Corps from applying the same standards and procedures to plaintiff's permit application that are applied to all other Section 404 permit applications.  With respect to the right to participate in the existing adjudicatory process, plaintiff claims that it is no different from any other applicant for a Section 404 permit.  Specifically, plaintiff urges that "[s]ome applicants may present meritorious applications and some may not, but all are similarly situated with respect to their equally-shared expectation that they will have the same opportunity to present their applications for a neutral and impartial adjudication based upon the same standards and procedures set forth in the CWA and the implementing regulations."  (Plaintiff's Merits Brief at 14).

        Plaintiff then argues that there is no rational basis for singling plaintiff out and depriving it of access to the existing adjudicatory process.  While acknowledging that "certain Congressmen" wished to block plaintiff's permit application, plaintiff maintains that "this alleged justification cannot withstand rational basis scrutiny because the legislative distinction made by Congress– that the Corps may not grant due process and equal protection to Norton- is not a legitimate nor rational means to accomplish this purported goal."  (Plaintiff's Merits Brief at 17).  If Congress wanted to prevent plaintiff's proposed landfill project from going forward,

----

[10]     Plaintiff notes that the Corps has stipulated that it is not aware of any other appropriation rider that has ever been interpreted by the Corps as prohibiting the processing of a permit application, except for an identically-worded appropriation rider pertaining to the Indian Run Sanitary Landfill in Stark County, Ohio. (Stipulations at ¶ 5).  The rider pertaining to the Indian Run Sanitary Landfill was first passed as part of congressional appropriation provisions for fiscal year 2004. *See* Section 104 of Public Law No. 108-137.  *Id*.  Thus, plaintiff maintains that the 2003 appropriation rider at issue in the instant case is "the first time that Congress has ever attempted to enact an appropriations rider of this nature."  (Plaintiff's Merits Brief at 5, fn 2).

21

plaintiff argues that it should have amended the existing laws to change the legal standards that govern all dredge and fill permits throughout the country.  By targeting plaintiff in particular and depriving it of obtaining any consideration of its application on the merits, plaintiff argues that Congress denied it the equal protection of the laws, "an arbitrary, irrational and unconstitutional result that is not a legitimate governmental purpose under the U.S. Constitution."  (Plaintiff's Merits Brief at 18).

Defendants argue that plaintiff's equal protection claim must fail for two reasons.  First, defendants argue that plaintiff has failed to show a classification or disparate treatment.  Without citing any legal authority, defendants maintain that "[e]nactments that concern parcels of land do not make legislative classifications at all, let alone the type prohibited by the equal protection clause."  (Defendants' Merits Brief at 20).  Defendants further argue that Congress' concerns in this case are unique to plaintiff's particular property and, therefore, plaintiff cannot establish that it is similarly situated to all other Section 404 permit applicants.

Defendants then argue that plaintiff's equal protection claim fails for the additional reason that the riders at issue are rationally related to a legitimate governmental interest.  Specifically, defendants cite statements by the sponsoring legislators (discussed *supra*) indicating that the riders were enacted due to several congressional concerns, including: (1) potential threats to the region's water supply, since the proposed landfill sits atop a drinking water aquifer; (2) potential harm to neighboring property, known as Tusc Woods;[11] and (3) disruptions to the local

---

[11]     Tusc Woods is owned by the Wilderness Center, a non-profit land and wildlife organization.  According to documents in the Administrative Record, the Wilderness Center has asserted that Tusc Woods is "a natural area with mature forest and high species diversity" and "will be directly and negatively affected by surface runoff and other off site effects."  Admin. Rec. 9B.  *See also* Exhibits 9

22

community resulting from the construction of the landfill.  Defendants argue that these concerns "would have obvious impacts on interstate commerce and fall comfortably within the purview of the CWA and Congress' broad Commerce Clause authority." (Defendants' Merits Brief at 23). Moreover, defendants argue that these concerns easily demonstrate a rational basis for the enactment of the riders.   For these reasons, defendants argue that plaintiff's equal protection claim suffers from a myriad of deficiencies and should be rejected by this Court.[12]

The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction, the equal protection of the laws."  U.S. Constitution, Amend. XIV.  As the Supreme Court has explained, the purpose of this clause "is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  *Village of*

---

and 10 to defendants' Merits Brief.

[12]    Defendants also argue that plaintiff's equal protection claim is not ripe for review because "other procedural avenues remain."  (Defendants' Merits Brief at 19). Specifically, defendants claim that plaintiff's failure to pursue its Fifth Amendment takings claim in Federal Claims Court is fatal to its equal protection claim as a matter of law.  The Court rejects this argument.  As set forth at length *supra*, this Court has found that plaintiff's constitutional claims are not "disguised" takings claims. Plaintiff's alleged injury is the denial of equal access to the adjudicatory process provided by Section 404 of the CWA and the remedy sought is purely equitable. As such, this claim would not be cognizable in Federal Claims Court because that court (1) does not have jurisdiction over claims based on the Equal Protection Clause, and (2) can only grant equitable relief if it is tied and subordinate to a claim for money damages, which is not the case herein.  *New York Power Authority v. United States*, 42 Fed. Cl. 795, 801-801 (Fed. Cl. 1999). Thus, defendants have not identified another procedural avenue that is open for plaintiff with regard to this claim.  Further, this Court has already found that the Corps' decision to return plaintiff's permit application constitutes a "final agency action."  *See* June 14, 2004 Memorandum of Opinion & Order at 21 -22. Accordingly, the Court finds that plaintiff's equal protection claim is ripe for review.

*Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923)).  It is well-established that the concept of equal protection, though expressly applicable to the States, applies equally to the federal government pursuant to the Fifth Amendment Due Process Clause.  *See Federal Communications Comm'n v. Beach*, 508 U.S. 307, 312 (1993).

Where legislation uniquely and adversely impacts a suspect class or invades a fundamental right, courts employ the most rigorous standard of review – the "strict scrutiny" standard.  *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985). Under this standard, such laws will be sustained only if they are suitably tailored to serve a compelling government interest.  *Id.  See also 37712, Inc. v. Ohio Department of Liquor Control*, 113 F.3d 614, 621 (6th Cir. 1997).  Where, however, legislation does not target a suspect class or burden a fundamental right, it will withstand constitutional scrutiny so long as "there is a rational relationship between the disparity of treatment and some legitimate government purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993)). *See also Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 531 (6th Cir. 1998).

In the instant case, the parties do not dispute that the "rational basis" test applies to plaintiff's equal protection claim.  Under this standard, the legislation at issue must be afforded a strong presumption of validity.  *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000).  As the Sixth Circuit has explained, "[t]he government has no obligation to produce evidence to support the rationality of its statutory classifications and may rely entirely on rational speculation unsupported by any evidence or empirical data."  *Id*.  Moreover, the legislature is "not even required to articulate any purpose or rationale in support of its legislation."  *Id*.  Accordingly, in

24

order to prove that the legislation at issue herein violates equal protection, plaintiff Norton must "negative every conceivable basis which supports [the legislation], . . . whether or not the basis has a foundation in the record." *Id.* (quoting *Heller*, 509 U.S. at 320).

That being said, rational basis review "is not 'toothless.'" *Peoples Rights Organization*, 152 F.3d at 532 (quoting *Mathews v. Lucas*, 427 U.S. 495, 510 (1976)). *See also Hadix*, 230 F.3d at 843 (stating that "rational basis review is not a rubber stamp of all legislative action, as discrimination that can only be viewed as arbitrary and irrational will violate the Equal Protection Clause"). The Supreme Court has noted that "[e]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained. The search for the link between classification and objective gives substance to the Equal Protection Clause." *Romer v. Evans*, 517 U.S. 620, 632 (1996). In sum, the rational basis test requires the court to ensure that "the government has employed rational means to further its legitimate interest." *Peoples Rights Organization*, 152 F.3d at 532. *See also Cleburne*, 473 U.S. at 446 (stating that governments "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational").

For the following reasons, the Court finds that the appropriations riders at issue herein violate plaintiff's equal protection rights. As an initial matter, the Court rejects defendants' argument that plaintiff has failed to show a classification or disparate treatment. First, defendants' argument that "enactments regarding parcels of land do not make legislative classifications" misses the point. The basis of plaintiff's equal protection claim is that Congress singled plaintiff out in denying it access to the *adjudicatory process* established by the CWA for

25

Section 404 permit applications.[13]  For the same reason, the Court rejects defendants' argument that plaintiff is not similarly situated to all other applicants in light of Congress' particular concerns regarding plaintiff's property.  The issue here is the availability of the adjudicatory process that has been established for granting or denying Section 404 permit applications.  With respect to this issue, plaintiff is similarly situated with all other applicants.  Each applicant comes to the Corps with the expectation that its application will be processed according to the same standards and procedures as all other applicants.  The basis of plaintiff's claim of disparate treatment is the fact that Congress has singled it out and prohibited it from having its application processed according to the same standards and procedures governing all other applicants.  The Court finds that, in this respect, plaintiff has established that it has been accorded disparate treatment from other similarly situated Section 404 permit applicants.

The Court further finds that, notwithstanding the very deferential standard of review governing plaintiff's claim, the appropriations riders at issue herein do not survive rational basis review.  According to defendants, the primary purpose behind the riders is to address the potential threat posed by the proposed Ridge Landfill to the region's water supply and to the neighboring property, Tusc Woods.  Defendants also claim the riders are intended to prevent disruptions to the local community resulting from construction of the landfill.  It is undisputed that these are legitimate interests of the federal government.  As discussed below, however, where the riders fail to satisfy the rational basis test is in the attenuated relationship between these goals and the classification adopted.

---

[13]    Although the riders do not on their face state that the Corps shall deny plaintiff access to the adjudicatory process, this is the inevitable result of prohibiting the Corps from spending any appropriated funds on plaintiff's proposed landfill.

26

On their face, each of the appropriations riders at issue specifically and exclusively target plaintiff's proposed landfill. *See* Appropriations Riders (providing that "[n]one of the funds appropriated in this Act may be used by the [Corps] to support activities related to the *proposed Ridge Landfill in Tuscarawas County, Ohio*") (emphasis added).  The riders expressly identify plaintiff's proposed Ridge Landfill as the subject of the spending prohibition, and do not address or identify any other specific landfill or landfills.  Indeed, by virtue of this specificity, no other landfill could conceivably fall within the riders' terms.

The Court finds that the extreme narrowness of the riders does not rationally serve Congress' apparent goals.  If Congress wanted to preserve the region's water supply or prevent harm to Tusc Woods and/or the local community, it is illogical and arbitrary for it to have aimed the rider solely and exclusively at plaintiff's proposed landfill. While plaintiff's proposed landfill project is effectively halted by the riders, there is nothing in the riders to prevent other developers from pursuing Section 404 permits to construct landfills that potentially threaten the region's water supply and/or the Tusc Woods area.  Indeed, on their face, the riders do not prevent another developer from purchasing from plaintiff the very parcel of land at issue herein, renaming the landfill project, and applying for a Section 404 permit to build a sanitary landfill on the same site. The riders' arbitrary targeting of the plaintiff's proposed Ridge Landfill project is simply not rationally related to furthering Congress' stated goals.

In this respect, the instant case is very similar to *Khodara Environmental, Inc. v. Beckman*, 91 F.Supp.2d 827 (W.D. Pa. 1999) *aff'd in part and vacated in part*, 237 F.3d 186 (3rd Cir. 2001).  In that case, plaintiff wished to develop a landfill on property which was located approximately 5.25 miles from the Dubois-Jefferson County Airport ("Airport") near Dubois,

27

Pennsylvania. *Id*. at 830. This landfill was to be called the "Happy Landing Landfill." *Id*. However, in 1996, Congress enacted the Federal Aviation Reauthorization Act of 1996 (hereinafter "the 1996 Amendment") which provided that: "in a case in which 2 landfills have been proposed to be constructed or established within 6 miles of a commercial service airport with fewer that 50,000 enplanements per year, no person shall construct or establish either landfill if an official of the Federal Aviation Administration ["FAA"] has stated in writing within the 3-year period ending on the date of the enactment that 1 of the landfills would be incompatible with aircraft operations at the airport, unless the landfill is already active on the such date of enactment or the airport operator agrees to the construction or establishment of the landfill." *Id*. at 833 (quoting Pub. L. No. 104-264, § 1220(a)).

Plaintiff's proposed landfill fell within the above statutory criteria because both the Happy Landing Landfill and another landfill (the Leatherwood Landfill) were located within 6 miles of the Airport, which was a commercial airport with fewer than 50,000 enplanements per year. Moreover, the FAA had issued a written determination within the preceding three years that the Leatherwood Landfill would be incompatible with aircraft operations at the Airport. The FAA acknowledged that, of all the landfills in the country, the 1996 Amendment's narrow criteria affected only the Happy Landing Landfill. *Khodara Environmental, Inc. v. Beckman*, 237 F.3d 186, 189-190 (3rd Cir. 2001).

Plaintiff subsequently filed suit in the Western District of Pennsylvania. Therein, plaintiff raised a variety of constitutional challenges to the 1996 Amendment, including that the Amendment violated its right to equal protection under the Fifth and Fourteenth Amendments. With respect to this claim, defendant FAA argued that the 1996 Amendment did not violate equal

28

protection because it was rationally related to the government's legitimate interest in enhancing aircraft safety.[14]

The District Court rejected the FAA's argument, finding that the "extremely specific criteria [of the 1996 Amendment] create a classification of affected landfills that is so grossly underinclusive as to be irrational." *Khodara*, 91 F.Supp.2d at 851. Specifically, while acknowledging that the enhancement of aircraft safety is a legitimate governmental interest, the district court found that drawing the 1996 Amendment along such narrow lines did not rationally serve the government's goals for a variety of reasons. For example, the court noted that "there is nothing apparently logical in applying the statute only to landfills near small commercial airports with less than 50,000 enplanements when presumably airports with a greater concentration of air traffic are more threatened by the potentiality of nearby landfills." *Id.* at 852. Moreover, the court stated that "it is hard to conceive of any rational purpose for" applying the protection only when two landfills are proposed (as opposed to three, four or five landfills) since "there is nothing about groups of 'two proposed landfills' – as opposed to other numbers– that logically relates to aviation safety so as to justify imposing it as a distinguishing characteristic of the class." *Id.* Finally, the court found that "there is an element of arbitrariness" in the statute's limited application to only a finite number of proposed landfills which are determined by retroactive events (i.e. an FAA determination within a closed three-year period that one of the two subject landfills is incompatible with airport operations) not necessarily within the control of

---

[14]    As part of its mission to promote safety in airport operations, the FAA has determined that municipal solid waste landfills attract birds, and that such landfills in the vicinity of airports increase the potential for bird strikes. *Khodara*, 91 F.Supp.2d at 832.

the affected landowner.  *Id.*

Based on the above reasoning, the court held that "the class of affected landfills is too attenuated to be considered rationally related to the legitimate governmental goal of enhanced aviation safety." *Id.* at 853.   Further, the court held that there was nothing unique about the Airport that justified distinguishing it from other airports relative to the goal of enhanced aviation safety, and that, even if there was, "it is irrational for Congress to expressly limit the protection to a 'hermetically sealed' number of landfills. . . " *Id.* at 855-856.   Accordingly, and "notwithstanding the very deferential approach with which we must view the FAA Amendment," the court found that that Amendment did not survive rational basis review and granted plaintiff's motion for summary judgment as to its equal protection claim.  *Id.* at 857.

The Court finds that *Khodara* is analogous to the instant case and that the district court's reasoning is persuasive.[15]  Like the statute at issue in *Khodara*, the riders herein are drawn in such a narrow fashion so as to render defendants' rational basis arguments untenable.  There is simply no logical basis to prevent the expenditure of appropriated funds as to plaintiff's proposed landfill in the name of protecting the region's natural resources, but not extending this limitation

---

[15]       In 2000, after the district court issued its opinion, Congress enacted legislation substantially modifying the 1996 Amendment. *Khodara*, 237 F.3d at 192. The 2000 Amendment significantly broadened the scope of the statute and did not work to single out the Happy Landing site for exceptional treatment.  *Id.* Thus, on appeal, the Third Circuit found that the 2000 Amendment resolved many of the district court's equal protection concerns and, therefore, mooted plaintiff's constitutional challenges to the 1996 Amendment.  *Id.* at 192-193.  In addition, the Third Circuit vacated the district court's judgment as to the unconstitutionality of the 1996 Amendment but stated that, "in so doing, we do not express any view as to the correctness of the District Court's ruling on [plaintiff's] equal protection claim regarding the 1996 Amendment." *Id.* at 195, fn. 9.  Under these circumstances, the Court finds the district court's reasoning persuasive, despite the fact that its judgment was vacated in light of the 2000 Amendment.

with regard to any other landfills or landfill operators in that region. As enacted, then, the riders are simply not a rational means of achieving Congress' apparent goals.  Rather, by singling out plaintiff's proposed landfill project for disparate treatment in this manner, Congress has employed its appropriations power in an unconstitutional manner, violating plaintiff's equal protection rights.  The Supreme Court has held that Congress cannot use its appropriations power to effect an unconstitutional result.  *See United States v. Lovett*, 328 U.S. 303 (1946).

Accordingly, the Court finds that the appropriations riders at issue herein violate plaintiff's equal protection rights, and enters judgment in plaintiff's favor with respect to Count Six of its Amended Complaint.  In light of this finding, the Court further finds that it need not reach plaintiff's due process and separation of powers claims.

### Conclusion

For the reasons set forth above, the Court enters judgment in favor of the plaintiff Norton and hereby issues an Order (1) declaring that the appropriations riders at issue herein violate plaintiff's equal protection rights and are, therefore, unconstitutional; and (2) compelling defendant Corps to reinstate and complete the adjudication of plaintiff's permit application in accordance with the standards and procedures set forth in Section 404 of the Clean Water Act and the regulations promulgated thereunder.

IT IS SO ORDERED.


/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge
Dated: 5/10/05

31