**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Norton Construction Co.,** | ) | **CASE NO. 1:03-cv-02257** |
| *d/b/a* **Norton Environmental** | ) | |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| Vs. | ) | |
| | ) | |
| **U.S. Army Corps of Engineers, and** | ) | |
| **Colonel William E. Bulen** | ) | **Memorandum Opinion and Order** |
| | ) | |
| **Defendants.** | ) | |

**INTRODUCTION**

Currently before the Court are the merits briefs of Plaintiff Norton Construction Company ("Norton") and Defendants U.S. Army Corps of Engineers and Colonel William E. Bullen (collectively "the Corps"). The parties seek a decision as to whether the Corps has properly refused to process Norton's application for a permit under the Clean Water Act ("CWA"). For the following reasons, the Court finds that the Corps is entitled to judgment on Norton's claims.

1

**BACKGROUND**

The Court will assume familiarity with the Court's previous Orders (*See* Doc. 27, 56, 80) and the parties' Supplemental Stipulations (Doc. 83).  Norton is an Ohio corporation that seeks to construct the Ridge Sanitary Landfill ("Ridge Landfill" or "the Landfill") in Tuscarawas County, Ohio, approximately three miles south of Wilmot, Ohio.  In connection with its efforts to procure approval of the Landfill, Norton submitted to the Corps an application for a permit to dredge and fill certain areas of the property under Section 404(a) of the CWA, 33 U.S.C. 1344(a).  Specifically, the proposed location for the Ridge Landfill includes an unnamed tributary of the South Fork of Sugar Creek.  Sugar Creek eventually empties into the Tuscarawas River, which joins with the Walhonding River in Coshocton, Ohio to form the Muskingum River, which eventually empties into the Ohio River near Marietta, Ohio.

The Corps initially refused to process Norton's permit application as a result of certain federal Appropriations Riders which stated that "[n]one of the funds appropriated in this or any Act may be used by the United States Army Corps of Engineers to support activities related to the proposed Ridge Landfill in Tuscarawas County, Ohio."  Norton filed a Complaint against the Corps and the Court eventually held that the Appropriations Riders violated the Equal Protection guarantee of the Fifth Amendment to the Constitution.  The Corps appealed the Court's decision. While the appeal was pending, the latest Appropriations Rider expired.  Congress instead passed Section 103 of Public Law No. 109-103 of the Energy and Water Development Appropriations Act, 2006, 119 Stat. 2247-2284 (Nov. 19, 2005) ("Section 103").  Section 103 states the following:

> In order to protect and preserve the integrity of the water supply against further degradation, none of the funds made available under this Act and any other Act

>hereafter may be used by the Army Corps of Engineers to support activities related to any proposed new landfill in the Muskingum Watershed if such landfill --
>
>>(1) has not received a permit to construct from the State agency with responsibility for solid waste management in the watershed;
>>
>>(2) has not received waste for disposal during 2005; and
>>
>>(3) is not contiguous or adjacent to a portion of a landfill that has received waste for disposal in 2005 and each landfill is owned by the same person or entity.

The Corps then filed a Suggestion of Mootness and Request for Vacatur with the Sixth Circuit.  The Sixth Circuit agreed that the original case was moot and ordered that the judgment be vacated.  Norton then requested that the Corps proceed with adjudication and processing of its Section 404 permit application.  According to Norton, the Appropriations Riders had expired and Section 103 does not apply to the Ridge Landfill because it is not within the "Muskingum Watershed."  The Corps disagreed that the Ridge Landfill is not within the Muskingum Watershed and refused to process the application.  Norton responded by filing its Third Amended Complaint, which claims that the Corps has improperly interpreted Section 103 to cover the Ridge Landfill and that Section 103 violates the constitutional guarantees of separation of powers, equal protection, substantive due process and procedural due process.  The parties have provided the Court with merits briefs as well as an extensive factual record to resolve these disputes.

**DISCUSSION**

Plaintiff first challenges the Corps' interpretation of the Muskingum Watershed of Section 103 as reaching the waters of the Ridge Landfill.  If Norton's interpretation is correct,

that settles the matter as Section 103 does not prohibit the Corps from processing Norton's application.  However, if the Court accepts the Corps' interpretation it must then consider whether Section 103 is unconstitutional.  Plaintiff claims that Section 103 violates separation of powers as well as its rights to equal protection, substantive due process and procedural due process under the Fifth Amendment to the Constitution.  The Court will address each of these arguments in turn.

### The Muskingum Watershed

Norton challenges the Corps' conclusion that the Ridge Landfill falls within the Muskingum Watershed for purposes of Section 103 under the Administrative Procedures Act, 5 U.S.C. §§ 702, 706.  The Corps reads the term to encompass all waters that eventually empty into the Muskingum River, including the Tuscarawas River and its respective tributaries.  This definition corresponds to the traditional boundaries of the "Muskingum Watershed Conservancy District," a New Deal era flood control project.  The parties agree that the Corps' interpretation covers a vast swath of the state of Ohio, including approximately 8,000 square miles (or 1/5 of Ohio's total land area) in 18 counties.  Norton responds that the Muskingum Watershed is limited to the waters immediately adjacent to the Muskingum River.  The United States Geological Survey ("USGS") identifies this area as the Muskingum hydrologic unit 05040004, which the USGS also refers to as the "Muskingum Watershed."  Norton notes that the Ridge Landfill is located in the Tuscarawas hydrologic unit 05040001, which the USGS also refers to as the "Tuscarawas Watershed."

The final action of an administrative agency will be accepted unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §

706(2)(a).  When the issue is an agency's interpretation of a statute, courts employ a two-step inquiry.  *Wall v. U.S. Envtl. Prot. Agency*, 265 F.3d 426, 435 (6th Cir. 2001).  The first question the Court must always ask is whether Congress has spoken on the issue. *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); *Wall*, 265 F.3d at 435.  If so, there is no need to bother with questions of deference or review of administrative agencies.  *Chevron*, 467 U.S. at 842.  However, where the statute is silent or ambiguous with respect to a particular issue, the agency interpretation is typically subject to *Chevron* deference.  The issue becomes whether the agency's conclusion is based on a permissible construction of the statute.  *Chevron*, 467 U.S. at 842; *Wall*, 265 F.3d at 435.  The Court need not conclude that the agency's interpretation was the only permissible one or that the Court would have rendered the same interpretation.  *Chevron*, 467 U.S. at 842, n.11.

In making the initial determination of congressional intent, the Court may consider the language of the statute as well as its legislative history.  *See Chem. Mfrs. Ass'n v. Natural Res. Def. Council, Inc.*, 470 U.S. 116, 129, 134 (examining "wording and legislative history of the statute" to determine "unambiguous congressional intent").  On its face, the term Muskingum Watershed reasonably accommodates either party's definition.  Dictionary definitions such as "[t]he region draining into a river, river system, or other body of water"[1] or "the whole gathering ground of a river system"[2] are not conclusive either.

The legislative history is more revealing.  In the only substantive discussion of the bill

---

[1] American Heritage Dictionary of the English Language (4th Ed. 2000).

[2] The Compact Oxford English Dictionary at 2277 (2d ed. 1998).

that the Court's research has uncovered, Congressman Regula of Ohio stated the following regarding "a provision in the Energy and Water Development Appropriations Act of 2006 regarding the Muskingum Watershed in Ohio":

> The Muskingum Watershed encompasses 18 counties in Ohio and includes all of the area which drains into the Muskingum River and its tributaries where it joins with the Ohio River. * * * The threat that landfills pose to the aquifer and the watershed are too great to ignore. * * * All these factors contribute to the need to protect the Muskingum Watershed and the aquifer below it. * * * Having heard from my constituents concerning the potential dangers posed by the stress of additional landfills in the Muskingum Watershed, I have made this provision one of my top priorities in Congress.  I feel that the criteria set forth by the provision are fair, nondiscriminatory and of the utmost importance in preserving the quality of the aquifer for years to come.

151 Cong. Rec. H10360-01.

Congressman Regula's description of the Muskingum Watershed conforms to the Corps' interpretation and is persuasive.[3]  *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 585 (1988) ("It is the sponsors [of the statute] that we look to when the meaning of the statutory words is in doubt." (quoting *NLRB v. Fruit Packers*, 377 U.S. 58, 66 (1964))).  Moreover, as the Corps notes, Congress and the Corps have referred to the same area as the Muskingum Watershed Conservancy District since the New Deal era.[4]

---

[3]   The Court notes that courts do not afford great deference to congressional statements, even of a bill's sponsor, in all instances. This is typically when a bill was subject to significant debate or the statements of the legislator are contrary to the unambiguous text. Here, Congressman Regula's statements conform to an acceptable meaning of Muskingum Watershed, were not debated, and were within the Congressman's understanding as the representative for the impacted area.

[4]   Relatively recent legislation utilizes this term.  *See* 150 Cong. Rec. H10235-01 (providing $300,000 for the "Muskingum Watershed Conservancy District"); 149 Cong. Rec. H3701-01.

Accordingly, the Court finds that Congressional intent is clear—Section 103 was intended to apply to the Muskingum Watershed, as defined by the Muskingum River and all waters that eventually flow into the Muskingum River.  This includes the full 18-county area contemplated by the Corps, including the unnamed tributary of the South Fork of Sugar Creek found on Norton's proposed location for the Ridge Landfill.[5]

Even if the Court were to find the statute to be ambiguous, it finds that the Corps' interpretation is permissible.  Before reaching the Corps' specific interpretation, the Court must first decide whether the Corps is entitled to *Chevron* deference.  Norton claims that the Corps' interpretation of Section 103 is not entitled to *Chevron* deference for two reasons.  The first reason is technical—namely, that Section 103 was passed as part of an appropriations bill rather than a statute which it administers.  The second reason is Norton's assertion that the Corps' interpretation challenges the boundaries of congressional power.

This is the Corps' own appropriations bill.[6]  Accordingly, the Court believes that this interpretation was promulgated in the exercise of authority delegated generally to the agency.

---

[5] The Court is not unaware that the USGS has a water classification unit of the Muskingum Watershed corresponding to the narrow interpretation submitted by Norton.  However, in light of the clear evidence of Congressional intent and the lack of any evidence to tie the USGS definition to Section 103, the Court does not find the USGS definition to be particularly relevant.  Moreover, as the Court will explain *infra*, the USGS definition does not carry great persuasive weight in any event.

[6] Norton also argues that Section 103 should not be given deference because it "repeals" Section 404 of the CWA.  However, as the Corps notes, the appropriations rider does not actually repeal Section 404 and the Corps' regulations account for situations where action on a permit is prohibited by law.

*U.S. v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).  Because this was an appropriations bill related to matters already delegated to the Corps, it is reasonable to assume that to the extent the Congress was not clear it implicitly delegated interpretation of Section 103 to the Corps.  *See id.* at 229 (recognizing that delegation can be implicit); *Nat'l Leased Housing Ass'n v. U.S. Dept. of Hous.& Urban Dev.*, 2007 U.S. Dist. LEXIS 2859, *30-31 (D.D.C. Jan. 16, 2007) (analyzing a HUD appropriations bill under the *Chevron* standard); *Moore v. Navy Public Works Center*, 139 F. Supp. 2d 1349, 1357 (N.D. Fl. 2001) (applying *Chevron* deference to the Navy's interpretation of the Department of Defense Appropriations Act); *Am. Med. Ass'n v. Reno*, 857 F. Supp. 80, 84 n.7 (D.D.C. 1994) (applying *Chevron* deference to agency's interpretation of an appropriations act); *Gay Men's Health Crisis v. Sullivan*, 733 F. Supp. 619, 634 (S.D.N.Y. 1989) (explaining that "this Court must defer to an agency's reasonable construction of its own enabling legislation and of the appropriations bills that fund it").[7]

Norton is correct that courts will not extend *Chevron* deference "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power . . . ." *Solid Waste Agency of N. Cook County ("SWANCC") v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001).  However, the Court does not agree that the Corps' interpretation of the

---

[7]  *But see Ass'n of Civilian Technicians v. Federal Labor Relations Authority*, 370 F.3d 1214, 1222 (D.C. Cir. 2004) (explaining that "the court owes no deference to FLRA's interpretation of the appropriations act").  The *Civilian Technicians* Court cites *Kempenich v. Federal Labor Relations Authority,* 269 F.3d 1119 (D.C. Cir. 2001).  However, the *Kempenich* court refused to employ *Chevron* deference because the specific appropriations rider being interpreted—the Department of Defense Appropriations Act—was "a statute not committed to the [Fair Labor Relations] Authority's administration."  *Id*. at 1121.

"Muskingum Watershed" poses such a problem.  Norton makes broad allusions to federalism concerns and the fact that the Corps' interpretation essentially precludes a particular land use (i.e., for landfills) throughout a large portion of the state Ohio.  Norton has not, however, attempted to develop any argument that Section 103 reaches the "nonnavigable, isolated, intrastate waters" at issue in *SWANCC*, 531 U.S. at 171, or the "wetlands, which lie near ditches or man-made drains that eventually empty into traditional navigable waters" that the Supreme Court found beyond federal reach in *Rapanos v. U.S.,* 126 S. Ct. 2208, 2219 (2006).  Although one might have once raised legitimate arguments that the federal government should not be allowed to regulate unnamed tributaries of small creeks, that ship set sail long ago.[8]  *See Rapanos*, 126 S. Ct. at 2249 (Kennedy, J., concurring) (explaining that federal regulation of wetlands that are adjacent to tributaries and possess a significant nexus with navigable waters "will raise no serious constitutional or federalism concerns"); *see generally U.S. v. Riverside Bayview Homes, Inc.,* 474 U.S. 121 (1985); *Kaiser Aetna v. U.S.*, 444 U.S. 164, 173 (1979) (explaining that "[i]t has long been settled that Congress has extensive authority over this

---

[8]  It might be said that the Norton's federalism argument misses the boat entirely.  Indeed, a federal moratorium on Section 404 permits throughout Ohio for all Ohio land uses would have little impact on Ohio's ability to regulate land use absent the expansive jurisdiction granted by Congress to regulate the "waters of the United States," the Corps' expansive reading of that grant, and until recently, the judiciary's acquiescence that such a broad grant of federal power is constitutional.  *See Rapanos*, 126 S.Ct. at  2223-24 (plurality opinion).  The inevitable consequence of Congressional exercise of such broad federal power is a reduction in state autonomy.  *Cf. Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 290 (1981) (explaining that under the Commerce Clause "Congress could have enacted a statute prohibiting any state regulation of surface coal mining").

Nation's waters under the Commerce Clause" and that "congressional authority over the waters of this Nation does not depend on a stream's 'navigability'").  Simply put, landfills can be constructed without regard to Section 404 anywhere within the Muskingum Watershed so long as the landfill site does not have waters subject to the Corps' jurisdiction.  Because the Corps' interpretation does not implicate the boundaries of federal power implicated by *SWANCC* or *Rapano*s, the *SWANCC* Court's refusal to apply *Chevron* deference is not an issue here.[9]

Accordingly, assuming *arguendo* that the Court looks beyond congressional intent, the Court will afford the Corps the appropriate *Chevron* deference.  As the Court noted above, the Muskingum Watershed Conservancy was created in cooperation with the federal government and Corps during the New Deal era to provide flood control and water conservation for the entire Muskingum River Watershed Basin, an area roughly corresponding to the Corps' definition.  The Muskingum Watershed Conservancy District is still in operation to this day and released an Amendment to the Official Plan as recently as 2005.  Informal definitions provided by the Corps and EPA state that a "watershed" is the area where all waters flow to a single point.  The USGS equates a watershed with a "drainage basin" which is "[t]he land area drained by a river or a

---

[9] To the extent that Norton argues that the Corps' interpretation invokes the outer limits of congressional power for reasons related to equal protection, procedural or substantive due process, or separation of powers, the Court notes that Norton has not demonstrated that its alternative interpretation remedies these alleged constitutional infirmities except as applied to Norton.  *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 577 (seeking "another interpretation, *not raising these serious constitutional concerns,* that may fairly be ascribed to" the statute (emphasis added)).  Even under Norton's interpretation of Muskingum Watershed Congress has prohibited the Corps' from processing applications for any new landfills over a significant area.

stream." The Corps also submits a number of newspaper articles regarding Congressman Regula's support of Section 103 which explain that the Muskingum Watershed covers the entire 18-county area contemplated by the Corps' interpretation.

Norton's best argument rests on the USGS classification of the hydrologic unit 05040004 as the Muskingum Watershed. That hydrologic unit corresponds to the area surrounding the Muskingum River, while the Ridge Landfill is located in the Tuscarawas Watershed, hydrologic unit 05040001. However, the USGS also recognizes that a watershed is akin to a drainage basin. The USGS Tuscarawas unit, Muskingum unit, Mohican unit (05040002), Walhonding unit (05040003), Wills unit (05040005) and Licking unit (05040006) all fall within the "Muskingum River Drainage Basin," which is subregion 0504 and roughly aligns with the Corps' interpretation of the Muskingum Watershed. In light of the varying scope that can be afforded the word "watershed," USGS' own understanding that a watershed can equate to a drainage basin, and the fact that the Muskingum River Drainage Basin is equivalent to Corps' understanding of the Muskingum Watershed, the USGS use of that term to also refer to a smaller hydrologic unit cannot overcome the deference due the Corps or the contrary evidence submitted by the Corps.

### Equal Protection

Under the Fourteenth Amendment no state shall "deny any person within its jurisdiction the equal protection of the laws." The same equal protection concepts applicable to the states under the Fourteenth Amendment are applicable to the federal government as a component of the Due Process Clause of the Fifth Amendment. *United States v. Baker*, 197 F.3d 211, 215 & n.1 (6th Cir. 1999). With respect to equal protection, the Supreme Court has noted that nearly every

11

statue "classifies for one reason or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996). Accordingly, where a statute does not burden a fundamental right or target a suspect class, the legislative classification must merely bear some rational relation to a legitimate end. *Id*. The parties do not dispute that Section 103 is subject to this "rational basis" review.

The requirement that there be a relationship between the classification adopted and some legitimate end gives substance to the Equal Protection clause. *Romer*, 517 U.S. at 632. However, a law does not run afoul of the rational basis test simply because the Court finds that it is "unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Id*. Courts are "very reluctant . . . to closely scrutinize legislative choices as to whether, how, and to what extent [government] interests should be pursued." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 441-42 (1985). Accordingly, "[t]hose seeking to invalidate a statute using rational basis review must 'negative every conceivable basis that might support it.'" *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002) (quoting *Lehnkausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). The legislature's actual reasoning is irrelevant to rational basis review and the government's burden is satisfied by "rational speculation . . . unsupported by evidence or empirical data." *Craigmiles*, 312 F.3d at 224 (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)). Courts are "not bound by the explanations of the statute's rationality that may be offered by litigants or other courts." *Kadramas v. Dickinson Public Schools*, 487 U.S. 450, 463 (1988).

The parties do not dispute that the stated goal of protecting and preserving the integrity of the water quality of the Muskingum Watershed against further degradation is legitimate. Norton

12

simply challenges whether Section 103 is rationally related to this purpose.

Norton first argues that Section 103 improperly enacts a "barrier to a Section 404 permit based <u>solely</u> on a particular land <u>use</u> rather than any particular <u>impact</u> that <u>use</u> may have on waters subject to the Corps' jurisdiction." (Doc. 84 p.19) (emphasis in original). Norton then cites the CWA, *SWANCC*, and *Rapanos* for the proposition that the states retain the power to regulate land use. From this Norton posits that a distinction based on a land's use is wholly irrelevant to the achievement of the purported purpose of protecting the water quality in the Muskingum Watershed. The Court disagrees. A Section 404 permit, by definition, only relates to waters that the Corps is permitted to regulate. Any land use that requires a Section 404 permit potentially impacts those waters. Of course, the Court must still decide whether the particular "use" set out in Section 103 is rationally related to a legitimate end. However, there is nothing wrong with basing Section 103 on a land use *per se*.

Norton's other arguments address the issue of whether it was proper to single out proposed new landfills in the Muskingum Watershed. Norton first notes that the Muskingum Watershed, as interpreted by the Corps, encompasses a very large area with a variety of land and water uses, numerous water bodies of varying water quality, and varying social, economic and environmental conditions. Norton contends that Section 103 is improper because it "cannot rationally be argued that the purpose of the prohibition is to protect some identifiable waters subject to the Corps' jurisdiction" and "[t]here is obviously significant land within the 'Muskingum Watershed' that is well suited to the siting of a 'proposed new landfill.'" (Doc. 84 p.20). As for the former point, the Court finds it reasonable to assume that any new landfill that requires a Section 404 permit, placed anywhere within the Muskingum Watershed, would

13

implicate water quality concerns in that area and beyond.  Again, a Section 404 permit is only required where the Corps has the power to regulate.  The Court also finds it self-evident that a landfill in particular has a potential to impact water quality.  Although not necessary to save the legislation, this is supported by evidence submitted by the Corps.  As for the latter point, Norton seems to be questioning the wisdom of Section 404.  However, "[e]ven foolish and misdirected provisions are generally valid if subject to rational basis review."  *Craigmiles*, 312 F.3d at 223-24.

Norton's next argument challenges the fact that there is no prohibition on Section 404 permits for the expansion of existing landfills to areas which are contiguous or adjacent to these landfills.  It notes that there are already 26 solid and hazardous waste facilities in the Muskingum Watershed used for a variety of waste disposal purposes.  The Court disagrees that this implicates equal protection concerns.  The only issue is whether the restriction of Section 103 is reasonably related to a legitimate end.  Congress is not required to take an "all or nothing" approach when legislating.  *See 37712, Inc. v. Ohio Dept. of Liquor Control*, 113 F.3d 614, 622 (6th Cir. 1997) (holding that a distinction based on establishments' liquor licenses is proper and that it is not necessary to adopt an "all or nothing" approach).  Moreover, it is not difficult to find legitimate reasons for distinguishing between existing and new facilities, such as to limit the number of potential pollution sources.

Norton's final argument is that Section 103 fails to address any other use, proposed or existing, either within the Muskingum Watershed or elsewhere in the United States.  However, "the legislature must necessarily engage in a process of line drawing," *Beach*, 508 U.S. at 315, and here those lines—proposed new landfills in the Muskingum Watershed—have been drawn in

14

a reasonable manner. As Norton notes in other contexts, Section 103 is not particularly narrow. Even if it was, the "legislature must be allowed leeway to approach a perceived problem incrementally." *Beach*, 508 U.S. at 316; *see also Nixon v. Administrator of Gen'l Servs.*, 433 U.S. 425, 471 n.33 (1977) ("[M]ere underinclusiveness is not fatal to the validity of a law under the equal protection component of the Fifth Amendment, . . . even if the law disadvantages an individual or identifiable members of a group.").

The simple fact is that it is reasonable to conclude that Section 103 serves the stated purpose of protecting and preserving the integrity of the water quality of the Muskingum Watershed against further degradation.[10] Although rational basis review "is not toothless," *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 532 (6th Cir. 1998), the "very fact that [the impacts of new landfills] are 'arguable' is sufficient, on rational-basis review, to 'immunize' the legislative choice from constitutional challenge." *Heller v. Doe*, 509 U.S. 312, 333 (1993) (citations omitted).

Due Process

Norton's substantive and procedural due process claims fail for at least two reasons.

---

[10] This is not only reasonable, but likely. This case is quite different from instances where there was another alternative reason which was both clear and improper. *See Romer*, 517 U.S. at 634-35 (holding that a Colorado law "classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else"); *City of Cleburne*, 473 U.S. at 450 (holding that "requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded" rather than the stated reason of avoiding concentration of population and lessening congestion); *Craigmiles*, 312 F.3d at 229 (explaining that the "proffered explanations for the" law were "pretextual" and the purpose was "to raise a fortress protecting the monopoly rents that funeral directors extract from consumers").

First, Norton concedes that "[i]n deciding whether legislation violates substantive and procedural due process, the Sixth Circuit has applied the same 'rational basis' standard that has been applied to equal protection claims."  (Doc. 84, p.23; Doc. 88, p.19).  Because the Court finds that the rational basis standard is met, Norton's due process claims fail.  Second, Norton has failed to identify a protected property interest for substantive or procedural due process analysis.

A due process violation requires "the existence of a constitutionally-protected property or liberty interest."  *Silver v. Franklin Township*, 966 F.2d 1031, 1036 (6th Cir. 1992).  In the context of property-related permits, a plaintiff must demonstrate a "legitimate claim of entitlement" or "a justifiable expectation" that the plan will be approved.  *Gen'l Motors Eng'rs & Assoc., Inc. v. West Bloomfield Township*, 922 F2d 328, 331 (6th Cir. 1990).  A plaintiff cannot do so where the reviewing body has discretion—i.e, where approval of the particular use is not mandatory even though certain minimal requirements are met.  *Silver*, 966 F.2d at 1036.  In this case, while the Court has found that without Section 103 the Corps would be obligated to *process* the application, under the governing law and regulations the Corps' has sufficient discretion as to whether the application is *granted* such that a Section 404 permit cannot be considered a property right.

Norton relies on *Logan v. Zimmerman Brush Co.* as supporting its due process claims.  455 U.S. 422 (1982).  However, *Logan* applied the same standard.  *See id*. at 430 (explaining that "property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause'").  The right the *Logan* plaintiff asserted was compared to numerous preexisting rights found to create a property interest, such as disability benefits or a high school education.  *Id*. at 431.  Based on these comparisons, the Supreme Court found that the state-

16

created right to redress discrimination was similar to those property rights in that it could "be surrendered for value." *Id*.  Here, by contrast, Norton claims a bare right to the Section 404 procedure, and does not contend that this right is akin to a cause of action with a present value as in *Logan*.[11]

Separation of Powers

Norton challenges Section 103 as a violation of separation of powers.  In short, Norton claims that under the Corps' interpretation of Section 103 Congress has usurped the role of the executive branch in implementing and executing laws.  The Constitution requires that "Congress play no direct role in the execution of the laws." *Bowsher v. Synar*, 478 U.S. 714, 736 (1986).  As the Supreme Court has explained:

> [I]n determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. *United States v. Nixon*, 418 U.S. [683,] 711-712 [(1974)]. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress.  *Ibid.*

*Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977).

The passage of a broad prohibition in an appropriations bill does not implicate the type of separation of powers concerns prohibited in earlier cases.  The legislation was properly passed

---

[11] In another case cited by Norton an actual federal cause of action was at issue. *Societe Internationale v. Rogers*, 357 U.S. 197, 209 (1958).  Norton also cites *Taylor v. U.S. Army Corps of Eng'rs*, 567 F.2d 1332 (5th Cir. 1978), for the proposition that "Federal courts have long held that the adjudication of permit applications under Section 404 of the Clean Water Act is subject to procedural due process scrutiny."  However, that case briefly considered and rejected an argument that the Corps' procedures run afoul of due process.

17

by both houses of Congress and signed by the President.  It is undisputed that Congress has plenary power over appropriations and Congress regularly exercises this power to prevent the expenditure of federal funds for certain activities.  *See, e.g., Amron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 991 & n.8 (3d Cir. 1986) (describing the "enormous authority" of Congress to dictate actions through "the power of the purse"); *Walker v. United States HUD*, 912 F.2d 819, 829 (5th Cir. 1990) (noting that "any exercise of a power granted by the Constitution to one of the other Branches of Government is limited by a valid reservation of congressional control over funds in the Treasury" (quoting *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990))) .  Separation of powers does not prohibit Congress from controlling the execution of laws by passing new legislation.  *Bowsher*, 478 U.S. at 734 (citing *Immigration & Naturalization Serv. v. Chadha* , 462 U.S. 919, 958 (1983)).  What Congress cannot do is *retain* control over the execution of laws through its own offices or in the form of a legislative veto. *See Chadha*, 462 U.S. at 952 (holding that an effective one-house veto over deportation decisions was improper); *Bowsher*, 478 U.S. at 726 (holding that it is improper for "the execution of the laws to be vested in an officer answerable only to Congress").  Finally, Norton challenges Section 103 as an attempt to dictate the outcome of a pending proceeding.  However, Norton has cited no cases that are applicable to a broad appropriations bill as opposed to a specific attempt to dictate a result in a particular proceeding.  Accordingly, the Court declines to find that Section 103 violates separation of powers.

### **CONCLUSION**

For the foregoing reasons, the Court finds that the Corps is entitled to judgment on all of

Norton's claims.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 5/14/07